* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Stanback with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. On May 26, 2000, an employee-employer relationship existed between plaintiff and defendant at all times relevant to this proceeding. *Page 2 
2. On May 26, 2000, defendant employed the requisite number of employees to be bound under the provisions of the North Carolina Workers' Compensation, and the parties were subject to the Act.
3. On May 26, 2000, Berkley Insurance Company of the Carolinas was the carrier on the risk.
4. Plaintiff's average weekly wage at the time of the alleged injury by accident was $400.00, which yields a compensation rate of $266.68.
5. The parties stipulated into evidence a packet of medical records (Stip. Exh. 1) and a packet of Industrial Commission Forms (Stip. Exh. 2). Subsequently, defendants offered into evidence the following additional exhibits: Axiom Report 10-14-05 (Def. Exh. 1); Axiom Report 11-11-05 (Def. Exh. 2); Axiom Video 10-13/10-14-05 (Def. Exh. 3); Axiom Video 10-20/11-20-05 (Def. Exh. 4); Omega Report 10-22-04 (Def. Exh. 5); Omega Report 11-11-04 (Def. Exh. 6); First Advantage Video 10-22-04 (Def. Exh. 7); and Omega Video 11-11-04 (Def. Exh. 8). At the time of Ms. Christie Howell's deposition, defendants moved into evidence Ms. Howell's resume (Def. Exh. 9), and a packet of vocational rehabilitation reports (Def. Exh. 10). All aforementioned exhibits are admitted into evidence.
6. Defendant contends the issues to be determined are:
 a. Whether plaintiff remains totally disabled as a result of his injury by accident of May 26, 2000;
 b. If so, whether plaintiff's benefits should be suspended as of the date of the filing of the most recent Form 24 for failing to comply with an Order of the Commission. On December 18, 2003, defendants filed a Form 24 Application to Suspend Payment of Compensation on the basis of *Page 3 
plaintiff's failure to comply with a previous Order to cooperate with vocational rehabilitation. The Form 24 Application was denied, and defendants requested an evidentiary hearing before a Deputy Commissioner. On August 10, 2005, defendants submitted another Form 24 to the Industrial Commission. The issues raised in the Form 24 Application are still pending and will be ruled upon in the Opinion and Award.
7. Plaintiff contends the issue to be determined at the hearing was whether plaintiff remains temporarily totally disabled as a result of his injury by accident of May 26, 2000.
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. On May 26, 2000, plaintiff was a right-hand dominant, 33 year-old male employed by defendant in Yard Sales Delivery. Plaintiff had been employed with defendant in that capacity for approximately one year.
2. Plaintiff completed the 11th grade and later obtained a GED. Plaintiff also holds a certification as an Auto Emissions Inspector and a valid North Carolina drivers' license. Plaintiff's work history prior to going to work for defendant involved truck driving, machine operating, and forklift driving.
3. On May 26, 2000, plaintiff sustained an injury arising out of his employment with defendant when he fell off a lumber stack, injuring his left side, arm, and hand. This injury was *Page 4 
deemed compensable, and defendants accepted plaintiff's claim by filing an Industrial Commission Form 60.
4. Following plaintiff's injury, plaintiff primarily came under the care of orthopedic surgeon Dr. Frank J. Rowan, orthopedic surgeon Dr. Gary Kuzma, and neurosurgeon Dr. O. Del Curling. Plaintiff's current diagnosis is neurogenic pain syndrome of the left upper extremity.
5. On January 7, 2002, a functional capacity evaluation was performed which determined that plaintiff was capable of performing work without the use of his left upper extremity at the medium physical demand level for eight hours per day. Following the functional capacity evaluation, rehabilitation efforts were initiated.
6. On October 28, 2002, Dr. Curling opined that plaintiff had reached maximum medical improvement with a fifty percent (50%) permanent impairment to plaintiff's left hand, and determined that plaintiff is capable of modified work with minimal use of the left arm, and minimal repetitive or overhead upper extremity work. Due to plaintiff's complaints of aggravated symptoms in cold or rainy weather, Dr. Curling also recommended that plaintiff avoid exposure to working in cold, precipitation, and wind, but clarified this did not preclude plaintiff from the ability to commute to work whenever it is cold outside. Although plaintiff claimed his ability to drive was impaired by his medications, which plaintiff claimed interfered with any vocational rehabilitation efforts, Dr. Curling did not find plaintiff to be restricted from driving and refused to assign driving restrictions. Dr. Curling further directed plaintiff to resume vocational rehabilitation based on the functional capacity evaluation results.
7. On April 16, 2003, Executive Secretary Weaver ordered that plaintiff participate in all reasonable vocational rehabilitation efforts. Defendants moved to suspend plaintiff's compensation for failing to cooperate in good faith with vocational rehabilitation and obstructing *Page 5 
the vocational rehabilitation process. Thereafter, defendants filed a Form 33 on June 3, 2003 on the grounds that plaintiff was no longer disabled as a result of his 2000 work injury. From that point forward, plaintiff's physical presentation of pain and functional ability took on a dramatic change.
8. On August 27, 2003, plaintiff presented to Dr. Curling for a follow-up exam and informed Dr. Curling that he had been undergoing vocational rehabilitation and going on job interviews. Although plaintiff's condition had not shown a significant change in symptoms in the previous year and a half following his last surgery, that particular visit marked the first time plaintiff presented with symptoms and behavior including favoring his left arm and keeping it close to his chest. Plaintiff also demonstrated what were reportedly side effects of medications such as difficulty with mentation and speech. Dr. Curling diagnosed plaintiff with chronic regional pain syndrome.
9. On December 4, 2003, plaintiff presented to Dr. Rowan claiming his pain symptoms were getting worse. Dr. Rowan described in his office note that plaintiff was sitting in such a way as to self-splint his left arm at all times. Dr. Rowan indicated that plaintiff seldom made eye contact during conversation and admitted that plaintiff had a very halting speech pattern secondary to the amount of medications he was taking. Dr. Rowan performed a physical examination, ordered x-rays, and administered a diagnostic injection, but was unable to identify any objective findings to explain plaintiff's dramatically increasing presentation of pain.
10. Plaintiff's physicians investigated measures to address plaintiff's new complaints into the first half of 2004, and even attempted to address his complaints of pain by inserting a temporary dorsal column stimulator. However, plaintiff experienced problems with the catheter, and returned two days later to have it removed. *Page 6 
11. On June 22, 2004, plaintiff returned to Dr. Curling after the bad experience with the stimulator. Dr. Curling noted that plaintiff clearly indicated that he did not wish to consider any further surgical intervention and that during this visit plaintiff presented in a manner with a far less dramatic presentation of pain or speech impediment. Accordingly, despite the number of medications plaintiff was taking, Dr. Curling reaffirmed the work restrictions he had assigned back in 2002, maintaining that plaintiff was at maximum medical improvement with no change in the permanent impairment of plaintiff's left arm. As Dr. Curling opined that plaintiff was capable of medium duty one-handed work, vocational rehabilitation efforts were initiated again with the assistance of vocational consultant Sabrina Wootier, M.R.C., CRC.
12. Plaintiff's initial assessment with Ms. Wootier took place on October 8, 2004. Plaintiff reported that his pharmacological regime, which included Ambien, Neurontin, Lorcet, Oxycontin, Amtriptilene, and a muscle relaxer, caused side-effects of short-term memory impairment, sluggishness, drowsiness, and difficulty driving. Ms. Wootier performed a transferable skills analysis and her findings were optimistic that plaintiff's past vocational experience and transferable skills made plaintiff an ideal candidate for a variety of light duty positions. Ms. Wootier devised an individualized vocational rehabilitation plan under which plaintiff was obligated to take affirmative steps and efforts in searching for a job.
13. On October 18, 2004, plaintiff saw Dr. Curling with dramatically increased complaints of pain in his left arm and new complaints of pain in the right arm. Dr. Curling recorded that plaintiff was sitting and ambulating with both arms protected against the chest as if held in imaginary slings, with clawing of the ulnar two fingers of his left hand. Dr. Curling recommended EMG and nerve conduction studies, but did not change plaintiff's work restrictions. *Page 7 
14. On October 26, 2004, Private Investigator Matt Grove performed video surveillance of plaintiff's activities. The video shows plaintiff working on his car, and having nearly an hour-long conversation with Mr. Grove while standing in his front yard. During that time, plaintiff did not hold his left arm up against his abdomen in a protective manner, nor did he appear to have difficulty conversing with Mr. Grove. Rather, throughout the video, plaintiff's movements are fluid, his arms in a natural position, either by his side or propped on his hip. Throughout the course of the conversation, plaintiff was observed gesturing with both hands as he spoke, and at one point went into to his house and returned with a stuffed deer head in his right hand, and a 7mm Savage Rifle in his left hand. Plaintiff shared with Mr. Grove that he was an avid deer hunter, typically hunting around the White Oaks and Lumberton area. Plaintiff also told Mr. Grove about his horses which are boarded in a nearby stable for $60 per month, offering that he was able to get such a low rate by trading his services in maintaining the horse stalls.
15. Additional video surveillance of plaintiff's activities was taken on November 11, 2004 and November 20, 2004. On November 11, 2004, plaintiff was observed leaving his house at 10:30 a.m. and driving to the public library, a gas station and a post office among other places, and was later observed shopping at Dick's Sporting Goods in the hunting section for an hour and a half before driving himself to an unknown private residence around 2:20 p.m. Once at the private residence, plaintiff was observed standing in front of his trunk and removing a hunting rifle, which he worked on while talking to children who presumably lived at the residence. According to his report, the private investigator stopped surveillance once it became apparent to him that plaintiff would be hunting on the private residence. Observation on November 20, 2004 showed plaintiff driving himself to the gas station in the morning, and then returning back home *Page 8 
without any apparent difficulty. Throughout this time of surveillance, plaintiff moved in a smooth, fluid manner without exhibiting external signs of impairment or physical restriction.
16. Vocational rehabilitation efforts continued throughout the remainder of 2004, and plaintiff successfully completed a certification program for Auto Emissions and Safety at Guilford Technical Community College in April 2005. Ms. Christy Howell, CRC, an associate of Ms. Wootier, came on as the vocational rehabilitation consultant assigned to plaintiff's case. In plaintiff's initial meeting with Ms. Howell, plaintiff reported he was currently receiving disability and was waiting to hear from the Social Security Administration regarding limits on how much he could work without losing his disability benefits.
17. Ms. Howell proceeded to assist plaintiff in securing two promising job leads for employment as an auto emissions inspector. In that regard, she met with Mr. Jeff Faircloth, the director of plaintiff's automotive program at Guilford Tech. Mr. Faircloth told Ms. Howell that plaintiff could definitely do the job of an inspector even with limited mobility in one arm, and stated plaintiff did very well in his courses and would be able to perform the job of an auto inspector. Mr. Faircloth assisted with plaintiff's return to work efforts by putting plaintiff in contact with a personal friend who owned the Texaco Xpress Lube in High Point and said he would speak to the owner on plaintiff's behalf. Additionally, plaintiff's inspection course instructor, Mr. Bill Jones, promised to assist plaintiff by putting him in contact with a personal friend who needed another inspector on his staff and who had already stated he was willing to hire an employee with a disability.
18. Ms. Howell set up various interviews for plaintiff, which plaintiff either did not keep, claiming he was in such severe pain, or attended the interview but essentially sabotaged it due to his pain behavior and otherwise inappropriate conduct. *Page 9 
19. Plaintiff's interview with Texaco Xpress Lube was scheduled for May 11, 2005. The day before this interview, plaintiff spoke with Ms. Howell and indicated that he would be able to attend the job interview the following day. However, Ms. Howell called plaintiff on the day of the interview to remind him when to meet her beforehand, but plaintiff's mother answered the phone and stated plaintiff could not come to the phone because he was sick in bed. When Ms. Howell returned to her office, there were no messages from plaintiff or his mother advising he would not attend the scheduled interview. Ms. Howell went to the Texaco Xpress Lube on plaintiff's behalf, and was advised to set up an interview for plaintiff. Accordingly, Ms. Howell rescheduled plaintiff's interview appointment for May 17, 2005.
20. On May 17, 2005, the day of the interview, plaintiff was late meeting with Ms. Howell outside the Texaco Xpress Lube, and told her he had spoken with the Social Security Administration and was told he had been approved for total permanent disability benefits. Plaintiff stated that he did not see why he had to interview with the Texaco Xpress Lube that day, in light of the Social Security decision.
21. Ms. Howell advised plaintiff to continue with the vocational rehabilitation process until told otherwise, so they proceeded into the Texaco Xpress Lube where plaintiff was given an application to complete. While plaintiff was completing the application, the manager, Mr. Neal, came in to introduce himself. Plaintiff did not acknowledge Mr. Neal's presence until prompted by Ms. Howell. Even then, plaintiff completed what he was writing, did not stand up, and shook Mr. Neal's hand from a seated position and went right back to writing on his application. Then, with Mr. Neal standing very close to plaintiff, plaintiff asked Ms. Howell what he should put for the reason he left his last job and stated loudly that he left because he was injured. *Page 10 
22. Ms. Howell also secured a job interview for plaintiff with Jiffy Lube for May 24, 2005. However, the day before that scheduled interview, plaintiff informed Ms. Howell that he would not attend the interview because he was driving his mother to Lexington. Ms. Howell obtained an application on plaintiff's behalf, but opined that plaintiff's being present for the initial interview would have provided the employer with an opportunity to interact with plaintiff in person, giving plaintiff the opportunity to make a good impression on the employer.
23. On June 8, 2005, another auto inspector job interview was set up for plaintiff with Magnum Car Wash and Quick Lube. A job analysis had been performed for that specific position and was approved by Dr. Curling as suitable work for plaintiff's physical limitations. At the interview, plaintiff took 35 minutes to complete the two-page application, and while completing it, stopped several times to stretch and groan as if in pain. While the employer was standing within hearing distance, plaintiff asked Ms. Howell how to respond to the question of whether he could perform the job duties of inspector which had already been confirmed by both the director and instructor of plaintiff's program at Guilford Tech, as well as Dr. Curling. While waiting for the employer to come in for the interview, plaintiff sat hunched over in his chair, with his eyes closed and forehead resting in his hands. Ms. Howell had to advise plaintiff to sit up straight and act professional.
24. During the face-to-face interview at Magnum Car Wash, when the employer asked plaintiff to tell him something about himself, plaintiff shook his leg rapidly and kept his forehead resting in his hand, not making eye contact and stuttering in a manner which was much more severe that what Ms. Howell had observed to be usual. Throughout the interview, plaintiff continued to sit hunched over for large portions of time with his forehead in his hand, and continuously drank some of his drink. Even so, the employer shared with plaintiff that he *Page 11 
sympathized with plaintiff's situation, told plaintiff he was interested in hiring him, and told the plaintiff than he wanted to work with him to see how they could make accommodations for him and find job tasks that he could do.
25. Plaintiff did not receive a job offer. In regard to plaintiff's performance at his job interviews, plaintiff had been provided with information about the skills and behaviors that were expected of him in those situations, but despite the coaching he received, plaintiff did not employ the use of those skills once he was in the interview situation.
26. On July 13, 2005, plaintiff met with Ms. Howell and told her he had been in too much pain to look for jobs on many occasions, this time presenting with his arm in a sling. He also shared with Ms. Howell that he had not been able to look for work during the entire first week of July because he had been on vacation. He complained that he could not use his left arm anymore and said he did not think he could work as an auto inspector because he could not remember anything and did not know the material well enough, even though his instructor had commented he had done well in his courses.
27. Following plaintiff's dramatically increased presentation of pain at his vocational rehabilitation meetings, defendants decided to put vocational rehabilitation efforts on hold in September 2005. On September 22, 2005, Ms. Howell attempted to call plaintiff to advise him that his rehabilitation had been put on hold, but plaintiff's mother advised Ms. Howell that he was vacationing in the mountains for the remainder of the week and through the weekend. Ms. Howell finally spoke to plaintiff on September 27, 2005, and advised him to keep looking for jobs on his own.
28. Having considered all of the competent, credible evidence of record, the undersigned find that plaintiff's sabotage of his job interview, and/or his failure to attend *Page 12 
interviews scheduled for him, amounted to constructive refusal of suitable employment, and that such refusal was not justified.
29. Additionally, plaintiff's conduct while participating in vocational rehabilitation with Ms. Howell, including failure to follow up on job leads, failure to attend interviews, and his effective sabotage of his interviews, amounted to a failure to cooperate with the defendants' reasonable vocational rehabilitation efforts in violation of Executive Secretary Weaver's April 13, 2003 Order. The undersigned find as fact that plaintiff has not fully cooperated with reasonable vocational rehabilitation as provided by defendants, and such refusal to cooperate is not justified.
30. Additional investigative surveillance footage was obtained of plaintiff in October and November of 2005 shortly before the evidentiary hearing before the deputy commissioner in this matter. Similar to the 2004 surveillance footage, plaintiff appears to function normally, with fluid movements and without an appearance of impairment or the use of orthopedic devices such as an arm sling. On October 13, 2005, plaintiff was observed driving a total of 44 miles as he left his house at 11:47 a.m. to run errands such as getting gas and picking up dry cleaning before spending an hour and a half shopping at a sporting goods store specializing in hunting and outdoor recreation. The next day, plaintiff was shown driving a total of 55 miles and running various errands. Private Investigator Jim Jackson's report and hearing testimony establish that plaintiff never appears in the surveillance footage to be self-slinging his arm or twitching uncontrollably about his arms and neck.
31. Mr. Jackson generated another surveillance report covering October 20, 2005-November 10, 2005, and commented generally in the report that plaintiff appeared to be an avid hunter and went hunting on numerous occasions. On October 20, 2005, plaintiff's mother told *Page 13 
Mr. Jackson that plaintiff had been in Virginia visiting friends for the past week, but would be back that afternoon. On November 1, 2005, plaintiff was observed leaving his house in the morning at 8:50 a.m. and driving 68 miles, non-stop to Virginia. The residence where plaintiff stopped appeared to be a hunting lodge, which was confirmed when he called plaintiff's home on November 3, 2005 asking to speak to plaintiff and was informed by plaintiff's mother that he was hunting and expected to return that evening or the next morning. On November 4, 2005, plaintiff was videotaped in the mother's back yard, using both hands to carry wood.
32. At the hearing in this matter before the deputy commissioner on December 1, 2005, Deputy Commissioner Stanback observed that plaintiff's physical presentation looked nothing like the man appearing in the video footage outlined herein. Plaintiff walked slowly across the courtroom as if limping as he approached to take the witness stand. Plaintiff held his arm close against his chest in an imaginary sling the entire time he testified for approximately one hour with his fingers clawed on his left hand. When testifying, plaintiff leaned his head to one side, stuttering, and rocking his head from side-to-side as he spoke very slowly. Occasionally throughout his testimony, plaintiff would suddenly jerk his head one way or another.
33. Plaintiff generally testified before the deputy commissioner that his physical presentation was typical for an average day of pain in his condition although plaintiff was never filmed presenting in a manner even close to these pain behaviors in the surveillance videos. Plaintiff claimed he could only allow his left arm to drop down by his side on very good days, which were few and far between. Plaintiff denied hunting and claimed he had sold all his guns. Plaintiff acknowledged he was not restricted from driving, but testified his medications impaired *Page 14 
his memory and ability to drive unless it was just for short distances during the 2-3 hours in the afternoon when the effects of his Oxycontin were not so severe.
34. Plaintiff also offered several alleged explanations for many of the inconsistencies in his testimony. In light of the multitude of inconsistencies in plaintiff's testimony as compared with the surveillance evidence and Ms. Howell's testimony, the undersigned find as fact that the videotape surveillance and Ms. Howell's testimony is more credible and given greater weight than plaintiff's testimony as to the extent of his disability.
35. Plaintiff claimed that he has continued looking for work since September 2005 by submitting three job applications. One application was for a job as a forklift operator, something he had done in the past, and he admitted he thought that job was within his restrictions and something he could do.
36. The only vocational expert to testify in connection with this case is certified vocational rehabilitation consultant Ms. Howell, who opined that plaintiff is capable of obtaining a job and working within the restrictions set by Dr. Curling. Taking plaintiff's limitations into account as well as his vocational background, Ms. Howell opined that there are suitable jobs available in plaintiff's local job market, especially in the field of auto emissions inspection where there is a steady demand due to a high turnover rate meaning that job openings in that field come open frequently. The evidence shows that suitable jobs were available, and that despite plaintiff's obstructive behavior, several employers were identified who needed employees capable of performing the skills plaintiff possessed and that were willing to hire disabled employees and work with plaintiff to accommodate his restrictions.
37. Further, as Ms. Howell testified, if plaintiff had made reasonably diligent efforts to seek suitable employment, he should have been able to obtain a job. In this regard, Ms. *Page 15 
Howell also testified that it would not be futile for plaintiff to continue to look for jobs. The undersigned assign great weight to Ms. Howell's testimony.
38. Plaintiff offered no evidence to refute Dr. Curling's permanent work restrictions or approval of the auto inspector job description. Plaintiff offered no evidence to refute Ms. Howell's testimony that he would be capable of earning wages if he were to cooperate with efforts at vocational rehabilitation.
39. Having considered all of the evidence of record, the greater weight of the evidence establishes that plaintiff has failed to meet his burden of proving he remains totally disabled. After October 28, 2002, plaintiff's inability to earn wages is not a result of his compensable injury by accident or related injuries, but is rather due to his non-cooperation with reasonable vocational rehabilitation efforts.
 * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Where defendant has accepted a workers' compensation claim by filing a Form 60, plaintiff bears the burden of proving both the existence and degree of his ongoing disability. Saums v. RaleighCommunity Hospital, 346 N.C. 760, 763, 487 S.E.2d 746, 749 (1997). Plaintiff has failed to meet his burden of proving that he remains totally disabled. N.C. Gen. Stat. § 97-2(9) (2005); Clark v.Wal-Mart, 360 N.C. 41, 619 S.E.2d 491 (2005); Johnson v. S. Tire Sales Serv., 358 N.C. 701, 599 S.E.2d 508 (2004); Burwell v. Winn-DixieRaleigh. Inc., 114 N.C. App. 69, 441 S.E.2d 145 (1994).
2. At the end of the healing period, plaintiff is entitled to receive compensation for total or *Page 16 
partial disability under N.C. Gen. Stat. §§ 97-29 or 97-30 or compensation for permanent partial disability under N.C. Gen. Stat. § 97-31, but not both. Collins v. Speedway Motorsports Corp.,165 N.C. App. 113,598 S.E.2d 185 (2004). Defendants are entitled to a credit against any permanent partial disability due for all temporary total disability benefits paid after plaintiff reached maximum medical improvement on October 28, 2002. Collins v. Speedway Motor SportsCorp., 165 N.C. App. 113, 598 S.E.2d 185 (2004); Arnold v.Wal-Mart, 154 N.C. App. 482, 571 S.E.2d 888 (2002).
3. Plaintiff has constructively refused suitable employment, and such refusal is not justified. N.C. Gen. Stat. § 97-32.
4. When plaintiff refuses to accept any medical or rehabilitative procedure as ordered by the Industrial Commission, such refusal bars plaintiff from further compensation until such refusal ceases, and compensation shall not be paid during the period of suspension unless the Industrial Commission determines that the circumstances of the refusal are justified. N.C. Gen. Stat. § 97-25. Plaintiff has not complied with Executive Secretary Weaver's Administrative Order of April 16, 2003 directing him to participate in all reasonable vocational rehabilitation efforts provided by defendants and such refusal to cooperate is not justified. Accordingly, Defendants Form 24 Application to Suspend Payments as of August 10, 2005 is allowed, and defendants are entitled to a credit for all temporary total disability benefits paid since that time.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following: *Page 17 
 AWARD
1. Defendants are entitled to suspend plaintiff's benefits as of August 10, 2005, and are entitled to a credit for all temporary total disability payments made to plaintiff since that time.
2. Defendants are entitled to a credit against any permanent partial disability due for all temporary total disability payments made to plaintiff since plaintiff reached MMI as of October 28, 2002.
3. Each side shall bear its own costs.
This the 12th day of November 2007.
S/______________________ BUCK LATTIMORE COMMISSIONER
 CONCURRING: S/______________________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________________ PAMELA T. YOUNG CHAIR *Page 1